1

2

3

4

5

6

7

8 IN THE UNITED STATES DISTRICT COURT

9 FOR THE EASTERN DISTRICT OF CALIFORNIA

10 JOSEPH G. ALCALA,

11           Petitioner,                     No. CIV S-08-2455-JAM-TJB

12        vs.

13 BOARD OF PAROLE HEARINGS,

14           Respondent.              <u>FINDINGS AND RECOMMENDATIONS</u>

15        _____/

16                        I. INTRODUCTION

17       Petitioner Joseph G. Alcala is a state prisoner proceeding pro se with a petition for writ of

18 habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that

19 the petition be denied.

20                    II. PROCEDURAL HISTORY

21       Petitioner is currently serving a sentence of 15 years to life, with a two-year enhancement

22 for use of a firearm, CAL. PENAL CODE § 12022.5, following his 1980 conviction for second

23 degree murder and robbery in the Los Angeles County Superior Court. Resp't's Answer Ex. C1,

24 at 68, ECF No. 16; Parole Hr'g Tr. 1, Nov. 28, 2006; *see* Resp't's Answer Ex. B, at 2 ("He was

25 sentenced to 17 years to life."); *but see* Pet'r's Am. Pet., pt. 1, at 1, ECF No. 11 (stating sentence

26 was "15 years to-life with the possibility of parole, plus 3 years"). In the instant action,

1

1 Petitioner challenges the decision by the California Board of Parole Hearings (the "Board")

2 denying Petitioner parole. Petitioner appeared before the Board on November 28, 2006, where

3 Petitioner elected to represent himself. Resp't's Answer Ex. C1, at 92-93; Parole Hr'g Tr. 25-26.

4     On April 6, 2007, Petitioner filed a petition for writ of habeas corpus with the Los

5 Angeles County Superior Court challenging the Board's decision. *See* Resp't's Answer Ex. A.

6 The Superior Court issued a reasoned opinion, dated September 21, 2007, denying the petition.

7 *See* Resp't's Answer Ex. B. On January 23, 2008, Petitioner sought relief in the California Court

8 of Appeal, Second Appellate District. *See* Resp't's Answer Exs. C1-C2. On February 13, 2008,

9 the Court of Appeal summarily denied the petition, citing *In re Dannenberg*, 34 Cal. 4th 1061,

10 1070-71, 23 Cal. Rptr. 3d 417, 104 P.3d 783 (2005), and *In re Rosenkrantz*, 29 Cal. 4th 616, 128

11 Cal. Rptr. 2d 104, 59 P.3d 174 (2002). *See* Resp't's Answer Ex. D. On April 15, 2008,

12 Petitioner sought relief in the California Supreme Court, which denied the petition without a

13 written opinion. *See* Resp't's Answer Exs. E1-F; *see also* Pet'r's Am. Pet., pt. 1, at 37.

14     On October 16, 2008, Petitioner filed his federal petition for writ of habeas corpus. He

15 amended the petition on November 25, 2008, and December 10, 2008. Respondent filed an

16 answer to the petition on February 6, 2009, to which Petitioner filed a traverse on March 10,

17 2009.

18                          III. FACTUAL BACKGROUND

19          The record reflects that on February 6, 1979, the Petitioner
            answered an ad regarding a Porsche for sale and scheduled a test
20          drive with the victim, David Meyers. After the test drive, Mr.
            Meyers exited the car and the Petitioner began to drive off. Mr.
21          Meyers attempted to stop the Petitioner, by grabbing his arm
            through the car window. The Petitioner then pulled out a gun and
22          shot Mr. Meyers in the chest, killing him. After Mr. Meyers fell to
            the ground, the Petitioner exited the vehicle and left.
23
            On August 16, 1979, just over five months after he killed Mr.
24          Meyers, the Petitioner answered another ad regarding a Porsche for
            sale and requested a test drive. The Petitioner again waited for the
25          victim to exit the car and then drove off. He was later pulled over
            for speeding in the stolen Porsche and arrested. He was then also
26

                                            2

1                      charged with the murder of David Meyers.[1]

2   Resp't's Answer Ex. B, at 2.

3            Prior to his arrest, Petitioner "left high school in [his] senior year." Resp't's Answer Ex.

4   C1, at 110; Parole Hr'g Tr. 43. Petitioner was 24 years old when he shot the victim. Resp't's

5   Answer Ex. C1, at 97; Parole Hr'g Tr. 30. He "didn't have a job" and "was taking drugs,"

6   including alcohol, marijuana, and PCP. Resp't's Answer Ex. C1, at 97; Parole Hr'g Tr. 30.

7            While incarcerated, Petitioner completed a lot of self-help programming. Petitioner

8   participated in: (1) the Lifers Group for "stress management" and "relaxation training;" (2) the

9   Amerikam Program; (3) a class called "Responsibility of Self-Determination;" (4) Life Without a

10   Crutch; (5) Seminar in the Christian Discipleship; (6) Parenting, Social Master Life; (7) Life

11   Skills Development; (8) Health Development; (9) the Master Life Program; and (10) another

12   Bible class. Resp't's Answer Ex. C1, at 111; Parole Hr'g Tr. 44; *see* Resp't's Answer Ex. C2, at

13   13; Parole Hr'g Tr. 81. Petitioner was active in Narcotics Anonymous (NA) from 1991 to 1992,

14   and from 2000 to 2005. Resp't's Answer Ex. C1, at 111-12; Parole Hr'g Tr. 44-45. In 1999,

15   Petitioner also attended Alcoholics Anonymous. Resp't's Answer Ex. C2, at 13; Parole Hr'g Tr.

16   81. At the time of the hearing, Petitioner was not attending NA because he "made a personal

17   decision after [he] came to prison that [he] was no longer going to take drugs or alcohol."

18   Resp't's Answer Ex. C1, at 112; Parole Hr'g Tr. 45.

19                 IV. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

20            An application for writ of habeas corpus by a person in custody under judgment of a state

21   court can be granted only for violations of the Constitution or laws of the United States. 28

22   U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

23

24              [1] These facts are from the Superior Court's opinion, dated September 21, 2007. *See* Resp't's Answer Ex. B, at 2. Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts

25   that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Moses v. Payne,* 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir.

26   2004).

1  *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

2  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

3  the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521

4  U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999). Under

5  AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

6  state court proceedings unless the state court's adjudication of the claim:

7
8
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

9
10
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

11  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

12  *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

13  In applying AEDPA's standards, the federal court must "identify the state court decision

14  that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

15  Where more than one state court has adjudicated a petitioner's claims, a federal habeas court

16  analyzes the last reasoned decision. *Id.* (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)

17  (finding presumption that later unexplained orders, upholding judgment or rejecting same claim,

18  rests upon same ground as prior order)). Thus, a federal habeas court looks through ambiguous

19  or unexplained state court decisions to the last reasoned decision to determine whether that

20  decision was contrary to or an unreasonable application of clearly established federal law. *Bailey*

21  *v. Rae,* 339 F.3d 1107, 1112-13 (9th Cir. 2003). "The question under AEDPA is not whether a

22  federal court believes the state court's determination was incorrect but whether that

23  determination was unreasonable-a substantially higher threshold." *Schriro v. Landrigan*, 550

24  U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

25  V. CLAIMS FOR REVIEW

26  The petition for writ of habeas corpus sets forth two grounds for relief, both of which are

4

1   due process claims. First, Petitioner argues that the "Board has failed to comply with any of the
2   mandatory provisions of [l]aw" by failing "to set his parole release date" because Petitioner: (1)
3   "appeared before the Board 7 times;" (2) "served 29 years of incarceration;" (3) "served beyond
4   his minimum and maximum parole release dates;" (4) met the Board's suitability factors for
5   parole; and (5) committed a commitment offense for which a release date "can be set." Pet'r's
6   Am. Pet., pt. 1, at 4. Second, Petitioner alleges that "[t]here is no evidence to support the
7   Board's contention that petitioner continues to pose an unreasonable risk of danger to society if
8   set." *Id.* Petitioner elaborates that the Board "continues to deny petitioner release on parole
9   based solely on his commitment offense." *Id.* For the following reasons, Petitioner's allegations
10  lack merit.

11          A. Legal Standard for Parole Denial

12          The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives
13  a person of life, liberty, or property without due process of law. A person alleging a due process
14  violation must first demonstrate that he or she was deprived of a protected liberty or property
15  interest, and then show that the procedures attendant upon the deprivation were not
16  constitutionally sufficient. *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989);
17  *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

18          A protected liberty interest may arise from either the Due Process Clause itself or from
19  state laws. *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987). The United States Constitution
20  does not, in and of itself, create for prisoners a protected liberty interest in the receipt of a parole
21  date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981). The full panoply of rights afforded a
22  defendant in a criminal proceeding is not constitutionally mandated in the context of a parole
23  proceeding. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme
24  Court has held that a parole board's procedures are constitutionally adequate if the inmate is
25  given an opportunity to be heard and a decision informing him of the reasons he did not qualify
26  for parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 16 (1979). If a

state's statutory parole scheme uses mandatory language, however, it "'creates a presumption that parole release will be granted' when or unless certain designated findings are made," thereby giving rise to a constitutional liberty interest. *McQuillion*, 306 F.3d at 901 (quoting *Greenholtz*, 442 U.S. at 12).

In California, Penal Code Section 3041 sets forth the state's legislative standards for determining parole for life-sentenced prisoners. Subsection (a) provides that "[o]ne year prior to the inmate's minimum eligible parole release date a panel . . . shall again meet with the inmate and shall normally set a parole release date . . . ." Subsection (b) provides an exception to the regular and early setting of a life-sentenced individual's term, if the Board determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ." Based on this statute, California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date. *Allen*, 482 U.S. at 377-78 (quoting *Greenholtz*, 442 U.S. at 12); *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903.

Additionally, as a matter of California state law, denial of parole to state inmates must be supported by at least "some evidence" demonstrating future dangerousness. *Hayward v. Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing *In re Lawrence*, 44 Cal. 4th 1181, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (2008); *In re Shaputis*, 44 Cal. 4th 1241, 82 Cal. Rptr. 3d 213, 190 P.3d 573 (2008); *In re Rosenkrantz*, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104, 59 P.3d 174 (2002)). California's "some evidence" requirement is a component of the liberty interest created by the state's parole system. *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010). The federal Due Process Clause requires, in turn, that California comply with its own "some evidence" requirement. *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam).

6

1 Thus, a reviewing court such as this one must "decide whether the California judicial decision
2 approving the . . . decision rejecting parole was an 'unreasonable application' of the California
3 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in
4 light of the evidence.'" *Hayward*, 603 F.3d at 562-63.

5 The analysis of whether some evidence supports the denial of parole to a California state
6 inmate is framed by the state's statutes and regulations governing parole suitability
7 determinations. *See Irons*, 505 F.3d at 851. A reviewing court "must look to California law to
8 determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then
9 must review the record to determine whether the state court decision holding that these findings
10 were supported by 'some evidence' [] constituted an unreasonable application of the 'some
11 evidence' principle." *Id.*

12 Title 15, Section 2402 of the California Code of Regulations sets forth various factors to
13 be considered by the Board in its parole suitability findings for murderers. The Board is directed
14 to consider all relevant, reliable information available regarding

15 the circumstances of the prisoner's social history; past and present
   mental state; past criminal history, including involvement in other
16 criminal misconduct which is reliably documented; the base and
   other commitment offenses, including behavior before, during and
17 after the crime; past and present attitude toward the crime; any
   conditions of treatment or control, including the use of special
18 conditions under which the prisoner may safely be released to the
   community; and any other information which bears on the
19 prisoner's suitability for release.

20 CAL. CODE REGS. tit. 15, § 2402(b). The regulation also lists specific circumstances which tend
21 to show suitability or unsuitability for parole. *Id.* § 2402(c)-(d).

22 Under the applicable state regulations, factors relating to a commitment offense tend to
23 show unsuitability for parole where (A) multiple victims were attacked, injured or killed; (B) the
24 offense was carried out in a dispassionate and calculated manner, such as an execution-style
25 murder; (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a
26 manner which demonstrates an exceptionally callous disregard for human suffering; or (E) the

7

1    motive for the crime is inexplicable or very trivial in relation to the offense. *Id.* § 2402(c)(1)(A)-

2    (E).

3       Section 2402(d) sets forth the circumstances tending to show suitability which include:

4
5
          (1) No Juvenile Record. The prisoner does not have a record of
assaulting others as a juvenile or committing crimes with a
potential of personal harm to victims.

6
7
          (2) Stable Social History. The prisoner has experienced reasonably
stable relationships with others.

8
9
          (3) Signs of Remorse. The prisoner performed acts which tend to
indicate the presence of remorse, such as attempting to repair the
damage, seeking help for or relieving suffering of the victim, or
indicating that he understands the nature and magnitude of the
offense.

10
11
          (4) Motivation for Crime. The prisoner committed his crime as a
result of significant stress in his life, especially if the stress has
built over a long period of time.

12
13
14
          (5) Battered Woman Syndrome. At the time of the commission of
the crime, the prisoner suffered from Battered Woman Syndrome,
as defined in section 2000(b), and it appears the criminal behavior
was the result of that victimization.

15
16
          (6) Lack of Criminal History. The prisoner lacks any significant
history of violent crime.

17
          (7) Age. The prisoner's present age reduces the probability of
recidivism.

18
19
          (8) Understanding and Plans for Future. The prisoner has made
realistic plans for release or has developed marketable skills that
can be put to use upon release.

20
21
          (9) Institutional Behavior. Institutional activities indicate an
enhanced ability to function within the law upon
release.

22    *Id.* § 2402(d)(1)-(9).

23       The overriding concern is public safety and the focus is on the inmate's *current*

24    dangerousness. *In re Lawrence*, 44 Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535 . Thus,

25    the proper articulation of the standard of review is not whether some evidence supports the stated

26    reasons for denying parole, but whether some evidence indicates that the inmate's release would

1  unreasonably endanger public safety. *In re Shaputis*, 44 Cal. 4th at 1254, 82 Cal. Rptr. 3d 213,

2  190 P.3d 573. There must be a rational nexus between the facts relied upon and the ultimate

3  conclusion that the prisoner continues to be a threat to public safety. *In re Lawrence*, 44 Cal. 4th

4  at 1227, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

5          B. State Court Decision

6          Here, because the California Supreme Court and California Court of Appeal summarily

7  denied the petition, the state court decision appropriate for review is the Superior Court's

8  decision. Under AEDPA's standards, the Superior Court properly held that "the record contains

9  'some evidence' to support the determination that the Petitioner presents an unreasonable risk of

10  danger to society and is, therefore, not suitable for release on parole." *See* Resp't's Answer Ex.

11  B, at 2. The Superior Court found the Board articulated negative factors, in addition to those

12  related to the commitment offense, which weighed in favor of denying parole. The Superior

13  Court evaluated Petitioner's (1) commitment offense; (2) institutional behavior; (3) prior

14  convictions; (4) lack of recent documentation regarding his parole plans; (5) unsupportive

15  psychological report from 2004; and (6) aggressive behavior at the parole hearing. *Id.* at 2-3.

16              1. Commitment Offense

17          First, the Superior Court properly noted that the Board considered Petitioner's

18  commitment offense, among other factors, when denying parole. *Id.* The Board read into the

19  record the summary of Petitioner's commitment offense, taken from the probation officer's

20  report, dated February 27, 1980. *See* Resp't's Answer Ex. C1, at 95-96; Parole Hr'g Tr. 28-29.

21  At the hearing and in summary, the Board explained its reliance, in part, on Petitioner's

22  commitment offense as follows:

23              This offense was in fact carried out in an especially cruel and
                callous manner, in that victim, David Meyers, a 24-year old man,
24              was particularly vulnerable in that he had advertised his Porsche
                for sale in the Los Angeles Times. And he took you for a test drive
25              in the hours of darkness, and he was unarmed. This offense was
                carried out in a dispassionate and calculated manner. You
26              admitted that on February 6th, 1979, at 21:00 hours, you posed as a

                                    9

1
2
3
4
5
6
7

> potential buyer. You armed yourself with a 357-Magnum with the
> intent of robbing Mr. Meyers of his Porsche at gunpoint. This
> offense was carried out in a manner demonstrating exceptionally
> callous disregard for human suffering. During a struggle for the
> gun, Mr. Meyers was shot in the chest. As to your prior criminal
> history, sir, you've minimized your criminal history to this panel
> today. . . . [Y]ou do have a history of prior violence of assaults,
> prior criminality that shows an escalating pattern of criminal
> conduct. . . . [Y]ou represented yourself today as having had a good
> family. . . . [I]n fact, . . . your history shows that you had an
> unstable and tumultuous . . . behavior that you've exhibited since
> childhood with your family.

8  Resp't's Answer Ex. C2, at 11-12; Parole Hr'g Tr. 79-80.

9        At the hearing, Petitioner answered the Board's question as to why he committed the

10  crimes. Resp't's Answer Ex. C1, at 97; Parole Hr'g Tr. 30. According to Petitioner, "this [wa]s

11  [his] first time ever attempting anything like this." Resp't's Answer Ex. C1, at 98; Parole Hr'g

12  Tr. 31. He was "not an experienced criminal going around doing this type of thing" because he

13  "usually held a job." Resp't's Answer Ex. C1, at 98; Parole Hr'g Tr. 31. Petitioner was looking

14  for a job for several months and was living with a friend. Resp't's Answer Ex. C1, at 98; Parole

15  Hr'g Tr. 31. He "had this bright idea" that if he could obtain a car to "get around" and "find a

16  job," then "everything would be all right." Resp't's Answer Ex. C1, at 98; Parole Hr'g Tr. 31.

17  He thought to himself, "[I]f I'm going to do something like this[,] I might as well get something

18  to my liking." Resp't's Answer Ex. C1, at 98 (internal quotation marks omitted); Parole Hr'g Tr.

19  31.

20        Petitioner claimed he "was on alcohol" when Petitioner committed the murder, but

21  Petitioner maintained he "was sober the second time." Resp't's Answer Ex. C1, at 98; Parole

22  Hr'g Tr. 31. Petitioner pointed out, during the "second time," "there was no injury to the

23  victim." Resp't's Answer Ex. C1, at 98; Parole Hr'g Tr. 31. Petitioner explained that when he

24  fired the "fatal shot," the victim had Petitioner in an "arm lock" and "twisted" Petitioner's arm.

25  Resp't's Answer Ex. C1, at 99; Parole Hr'g Tr. 32. Petitioner saw a police car coming, and

26  "everything in [his] mind was just to escape." Resp't's Answer Ex. C1, at 99; Parole Hr'g Tr.

10

32. Petitioner, therefore, "pulled the gun out" and "fired it." Resp't's Answer Ex. C1, at 99; Parole Hr'g Tr. 32. Petitioner "never looked back" and "just dove out of the window and took off running." Resp't's Answer Ex. C1, at 99; Parole Hr'g Tr. 32.

That night, Petitioner "made it to [his] friend's house." Resp't's Answer Ex. C1, at 99; Parole Hr'g Tr. 32. Petitioner informed his friend what happened, and "even asked him if [Petitioner] could make a phone call to find out what or if anything happened to this person." Resp't's Answer Ex. C1, at 99; Parole Hr'g Tr. 32. According to Petitioner, Petitioner's friend would not let Petitioner use his phone because the call was long distance. Resp't's Answer Ex. C1, at 100; Parole Hr'g Tr. 33. Later, Petitioner's friend "console[d]" and "convinced" Petitioner that "nothing happened," and Petitioner "probably didn't hit the guy." Resp't's Answer Ex. C1, at 100; Parole Hr'g Tr. 33. But, a month and a half later, Petitioner was "in the same predicament," so he decided that "this time," he was "going to take control of the situation before anything can happen." Resp't's Answer Ex. C1, at 100; Parole Hr'g Tr. 33. Petitioner "did it again," and "that's when [Petitioner] finally got . . . caught." Resp't's Answer Ex. C1, at 100; Parole Hr'g Tr. 33.

The Board found it "very hard to believe" that Petitioner was as "naive about this" as Petitioner represented. Resp't's Answer Ex. C1, at 101; Parole Hr'g Tr. 34. The Board revealed that "this wasn't [Petitioner's] first vehicle theft," and Petitioner "lied" by saying it was "the first time" he had done "anything like this." Resp't's Answer Ex. C1, at 101; Parole Hr'g Tr. 34. On February 7, 1972, Petitioner was "arrested for taking a vehicle without the owner's consent," and was confined in juvenile hall. Resp't's Answer Ex. C1, at 101; Parole Hr'g Tr. 34. On April 1, 1973, Petitioner was arrested for theft of personal property, CAL. PENAL CODE § 484(a). Resp't's Answer Ex. C1, at 101; Parole Hr'g Tr. 34. Petitioner plead guilty and was sentenced to four days in jail. Resp't's Answer Ex. C1, at 101-02; Parole Hr'g Tr. 34-35. When confronted, Petitioner repeatedly maintained he remembered "hardly anything" about these crimes because they happened so long ago. Resp't's Answer Ex. C1, at 103-04; Parole Hr'g Tr. 36-37. Thus,

11

1 | the Superior Court properly found that the Board weighed the nature and gravity of Petitioner's
2 | commitment offense.

3 |                    2.  Institutional Behavior

4 | Second, the Superior Court appropriately observed that Petitioner's "continued post-

5 | conviction violence demonstrates that he continues to be an unreasonable risk to public safety."

6 | Resp't's Answer Ex. B, at 3.  Petitioner acquired twenty-nine 128 violations.  Resp't's Answer

7 | Ex. C1, at 113-14; Parole Hr'g Tr. 46-47.  Petitioner's first 128 violation was in 1980, and his

8 | last one was in 2000 for disobeying a direct order.  Resp't's Answer Ex. C1, at 113-14; Parole

9 | Hr'g Tr. 46-47.  Petitioner, therefore, "had a 20-year period of committing 128s."  Resp't's

10 | Answer Ex. C1, at 114; Parole Hr'g Tr. 47.

11 | Petitioner also acquired sixteen 115 violations:

12 | [These] start[ed] in 1982 for disobeying orders, misuse of a
telephone, conduct, force and violence; . . . involvement in a
13 | physical altercation in '83; refusing to lock up in '83; fighting,
force and violence, '83; state property possession . . . '84; conduct,
14 | flooding your cell, '84; threatening staff, '85; possession of
contraband, an altered TV, '88; altering work pass, '88; . . .
15 | conduct, sexual harassment, '90; violence, fighting, '91; over
familiarization, '92; over familiarization, '92; and physical
16 | altercation, '94.

17 | Resp't's Answer Ex. C1, at 114; Parole Hr'g Tr. 47.  When the Board asked why Petitioner

18 | stopped committing 115 violations, Petitioner first responded, "[I]t's not an easy thing to do in

19 | prison."  Resp't's Answer Ex. C1, at 114; Parole Hr'g Tr. 47.  The Board asked Petitioner to

20 | "answer the question" because "we understand the prison environment."  Resp't's Answer Ex.

21 | C1, at 114; Parole Hr'g Tr. 47.  Petitioner then answered that he decided he "needed more . . .

22 | self-control . . . to get a parole release date."  Resp't's Answer Ex. C1, at 115; Parole Hr'g Tr. 48.

23 | Accordingly, the Superior Court appropriately noted that "Petitioner has not received a

24 | serious discipline for 12 years."  Resp't's Answer Ex. B, at 3.  However, Petitioner "had several

25 | 115s for violent conduct in the past, including acts of force or violence; physical altercations;

26 | mutual combat; and threatening staff."  *Id.*  The Superior Court, therefore, properly found that the

1  Board considered Petitioner's institutional behavior when denying parole.

2           3.  Prior Convictions

3           Third, the Superior Court reasonably found that the Board "considered Petitioner's non-

4  violent, theft-related prior convictions." *Id.* As stated earlier, on February 7, 1972, Petitioner

5  was arrested for taking a vehicle without the owner's consent. Resp't's Answer Ex. C1, at 101;

6  Parole Hr'g Tr. 34. On April 1, 1973, Petitioner was arrested for petty theft; Petitioner plead

7  guilty and was sentenced to four days in jail. Resp't's Answer Ex. C1, at 101-02; Parole Hr'g Tr.

8  34-35. In August 1973, Petitioner was arrested for possession of marijuana, which was "handled

9  through diversion and ultimately dismissed." Resp't's Answer Ex. C1, at 104; Parole Hr'g Tr.

10  37.

11          Petitioner was also "arrested and placed on two years probation and fined $250 for escape

12  from a jail with misdemeanor force and violence." Resp't's Answer Ex. C1, at 104; Parole Hr'g

13  Tr. 37. According to the Board, Petitioner escaped from custody of a marshal "on April 15[th],

14  while [he] w[as] appearing in Rio Hondo Municipal Court on a charge of possession of

15  marijuana." Resp't's Answer Ex. C1, at 106; Parole Hr'g Tr. 39. Petitioner, however, claimed

16  he "did nothing." Resp't's Answer Ex. C1, at 107; Parole Hr'g Tr. 40.

17          Rather, Petitioner alleged this information was incorrect because he "was released from

18  county jail . . due to . . . an appeal . . . ." Resp't's Answer Ex. C1, at 104; Parole Hr'g Tr. 37. At

19  the hearing, Petitioner contended, "[N]ot only . . . is it still being held against me, but they're also

20  saying it's with force and violence." Resp't's Answer Ex. C1, at 104; Parole Hr'g Tr. 37.

21  According to Petitioner, the case summary stated, "'4/18/75, escape W/O[,]'[] meaning without

22  force." Resp't's Answer Ex. C1, at 106; Parole Hr'g Tr. 39.

23          When rendering its decision, the Board reviewed Petitioner's prior convictions. The

24  Board considered that Petitioner had a juvenile hall commitment for vehicle theft and was placed

25  on adult probation. Resp't's Answer Ex. C2, at 12; Parole Hr'g Tr. 89. The Board also noted

26  that Petitioner "served county jail time" and "did an escape from custody." Resp't's Answer Ex.

1 | C2, at 12; Parole Hr'g Tr. 80. Thus, the Superior Court appropriately determined that the Board
2 | weighed Petitioner's prior convictions when denying parole.

3 |                  4. Lack of Recent Documentation Regarding Parole Plans

4 |         Fourth, the Superior Court properly affirmed the Board's determination that Petitioner
5 | had inadequate documentation of parole plans. Resp't's Answer Ex. B, at 3. The Board
6 | reviewed four support letters, all dated from 2004. The Board informed Petitioner that Petitioner
7 | was responsible for presenting the Board with current support letters. Resp't's Answer Ex. C1,
8 | at 125; Parole Hr'g Tr. 58. Petitioner insisted, "[T]hey're still active because my brother . . . has
9 | not changed his mind." Resp't's Answer Ex. C1, at 125; Parole Hr'g Tr. 58. The Board
10 | responded, "[I]t's important to have . . . updated information because lives change." Resp't's
11 | Answer Ex. C1, at 125; Parole Hr'g Tr. 58.

12 |         First, the Board considered Petitioner's letter from his older brother, Alfred Ramirez,
13 | dated from 2004. Resp't's Answer Ex. C1, at 124, 127; Parole Hr'g Tr. 57, 60. At the time of
14 | the hearing, Petitioner's older brother was "approximately 67-years old," with a "two-story home
15 | on an 80-acre" farm in Winchester, California. Resp't's Answer Ex. C1, at 123-24, 126; Parole
16 | Hr'g Tr. 56-57, 59. Petitioner affirmed "he would live in his guest house," and Petitioner would
17 | work on the farm. Resp't's Answer Ex. C1, at 127-29; Parole Hr'g Tr. 60-62.

18 |         Second, Petitioner presented a letter, dated March 5, 2004, from his sister, Vivian
19 | Resendez. Resp't's Answer Ex. C1, at 126; Parole Hr'g Tr. 59. Petitioner's sister was his "other
20 | option" for housing if he were paroled. Resp't's Answer Ex. C1, at 126; Parole Hr'g Tr. 59.

21 |         Third, the Board received a letter from Petitioner's cousin, Steve Montano, dated March
22 | 1, 2004. Resp't's Answer Ex. C1, at 127-28; Parole Hr'g Tr. 60-61. "Basically it's a support
23 | letter." Resp't's Answer Ex. C1, at 128; Parole Hr'g Tr. 61.

24 |         Fourth, the Board read a support letter from Petitioner's son, Daniel Alcala, dated July 5,
25 | 2004. Resp't's Answer Ex. C1, at 128; Parole Hr'g Tr. 61. At the hearing, Petitioner explained
26 | that his son was in Montebello and was married for 16 years; Petitioner "just had a visit maybe

1  two weeks ago from them." Resp't's Answer Ex. C1, at 128; Parole Hr'g Tr. 61.

2          Since "coming to prison," Petitioner received his GED in 1980. Resp't's Answer Ex. C1,

3  at 110; Parole Hr'g Tr. 43.  He received his high school proficiency in 1987, and he received his

4  high school diploma in 1994. Resp't's Answer Ex. C1, at 110; Parole Hr'g Tr. 43.  Petitioner

5  also held a number of jobs in prison, including being a Teacher's Aide, Vocational Electrician,

6  and Recreational Aide. Resp't's Answer Ex. C1, at 109-10; Parole Hr'g Tr. 42-43.  He was

7  involved in Correctional Industries, the Maintenance Warehouse, and the Vocational Mill and

8  Cabinet Program. Resp't's Answer Ex. C1, at 109; Parole Hr'g Tr. 42.  Petitioner worked in the

9  clothing room, the Furniture Refurbishing and Repair Program, and the Yard Crew. Resp't's

10  Answer Ex. C1, at 109; Parole Hr'g Tr. 42.  Additionally, Petitioner received a certificate in

11  Vocational Auto Machine in 2000. Resp't's Answer Ex. C1, at 109, 129; Parole Hr'g Tr. 42, 62.

12  During the hearing, Petitioner's "current assignment [wa]s as a Porter." Resp't's Answer Ex. C1,

13  at 110; Parole Hr'g Tr. 43.

14          When rendering its decision, the Board recognized that Petitioner "did not present current

15  parole plans to this Board." Resp't's Answer Ex. C2, at 14; Parole Hr'g Tr. 82.  Petitioner

16  completed his certificate in Vocational Auto Machine in 2000, and "those are perishable skills,"

17  which "need updating." Resp't's Answer Ex. C2, at 14; Parole Hr'g Tr. 82.  Thus, the Superior

18  Court properly found that the Board weighed Petitioner's lack of recent documentation regarding

19  his parole plans when denying parole.

20              5. Unsupportive Psychological Report

21          Fifth, the Superior Court appropriately determined that the Board reviewed Petitioner's

22  unsupportive psychological report from 2004 by Dr. Janet Mahoney.  In Dr. Mahoney's report,

23  she wrote:

24              Mr. Alcala stated he was resistant to answering my questions
               regarding . . . his psychiatric symptoms because he didn't want to
25              be classified as a mental health patient by the Board of Prison .
               Terms, being afraid that would delay his release. Mr. Alcala's
26              ventures into the mental health treatment program have been to get

15

1           symptom relief from his insomnia rather than partnering with
          mental health to diagnos[e] what is causing his insomnia. . . .

2

3           He stated to me that his paranoia was the result of all the negative
          experiences he's had in prison[,] liking [sic] it to a war zone. The
          question is whether Mr. Alcala is suffering from post-traumatic

4           stress disorder, as he thinks, or the after effects of a substantial use
          of PCP or a paranoid personality disorder, which is consistent with

5           being reared by an abusive father. What is noteworthy about Mr.
          Alcala's presentation is that his thinking system is rigid and he's

6           not willing to reality [sic] test his fears. Mr. Alcala goes to
          considerable effort to hide any symptom beyond the sleep

7           disruption. And it took me considerable interview time to get to
          how fearful he is. And clearly, it does not make sense when he

8           attributed his current sleep problems to the peers who played music
          all night at the last prison more than three years ago."

9

10 Resp't's Answer Ex. C1, at 117-18; Parole Hr'g Tr. 50-51. At the hearing, Petitioner denied

11 telling Dr. Mahoney that he felt paranoid. Resp't's Answer Ex. C1, at 120; Parole Hr'g Tr. 53.

12 Petitioner insisted, "She inserted that upon her own conclusions, based on her own conclusions."

13 Resp't's Answer Ex. C1, at 120; Parole Hr'g Tr. 53.

14         The Board relayed to Petitioner, "[B]asically, [Dr. Mahoney] does not support your

15 parole." Resp't's Answer Ex. C2, at 13; Parole Hr'g Tr. 81. Dr. Mahoney assessed Petitioner

16 "with a moderate risk of violence." Resp't's Answer Ex. C2, at 13; Parole Hr'g Tr. 81. Thus,

17 the Superior Court properly noted that Petitioner had "an unsupportive psychological report from

18 2004," which showed future dangerousness. Resp't's Answer Ex. B, at 3.

19                       6. Aggressive Behavior at Parole Hearing

20         Sixth, the Superior Court reasonably determined that the Board considered Petitioner's

21 aggressive behavior at the parole hearing. *Id.* The Board commented, "[B]ased on your

22 presentation today, we feel that [Dr. Mahoney's] view of you appears to play out here today."

23 Resp't's Answer Ex. C2, at 14; Parole Hr'g Tr. 82.

24         The record reflects that Petitioner was disruptive during the hearing. When the Deputy

25 District Attorney gave his closing statement, the Board had to inform Petitioner to "please sit

26 quietly and give the District Attorney time and listen to what he says, because I want to listen to

16

1  what he says. And I can't do that with you jumping around and shuffling papers." Resp't's
2  Answer Ex. C2,.at 1; Parole Hr'g Tr. 69. Petitioner responded, "I'm capable of multi-tasking. I
3  can hear him and . . . write at the same time. Excuse me." Resp't's Answer Ex. C2, at 2; Parole
4  Hr'g Tr. 70.

5  When Petitioner gave his closing statement, he attempted to read Title 15, Section 2402
6  of the California Code of Regulations. Resp't's Answer Ex. C2, at 7; Parole Hr'g Tr. 75. The
7  Board informed Petitioner he only had to reference section 2402 and should not read from it.
8  Resp't's Answer Ex. C2, at 7-8; Parole Hr'g Tr. 75-76. Petitioner answered, "You keep trying to
9  shut me up and you won't let me speak, okay. Now, my life is on the line here, so I believe that I
10  have every right to try to defend myself, or represent myself at least, you see." Resp't's Answer
11  Ex. C2, at 8-9; Parole Hr'g Tr. 76-77. The Board explained, "I'm trying to keep you focused."
12  Resp't's Answer Ex. C2, at 9; Parole Hr'g Tr. 77.

13  When rendering its decision, the Board recommended that Petitioner "advance [his]
14  trade." Resp't's Answer Ex. C2, at 17; Parole Hr'g Tr. 85. The Board explained, "Trades are
15  perishable skills," so it was important for Petitioner to update his skills. Resp't's Answer Ex.
16  C2, at 17; Parole Hr'g Tr. 85. Petitioner then interrupted, "They're viable skills, not perishable
17  skills. Excuse me." Resp't's Answer Ex. C2, at 17; Parole Hr'g Tr. 85. Thus, the Superior
18  Court properly observed that Petitioner's "aggressive behavior at the parole hearing
19  demonstrate[d] that he continues to be an unreasonable risk of danger and is, therefore,
20  unsuitable for parole." Resp't's Answer Ex. B, at 3.

21  In sum, the Superior Court reasonably concluded that "the record contains 'some
22  evidence' to support the determination that the Petitioner presents an unreasonable risk of danger
23  to society and is, therefore, not suitable for release on parole." *Id.* at 2. As the Superior Court
24  noted, "[t]he Board based its decision on several factors," including his (1) "commitment
25  offenses;" (2) "institutional behavior;" (3) "non-violent, theft-related prior convictions;" (4) "lack
26  of recent documentation regarding his parole plans;" (5) "unsupportive psychological report from

1  2004;" and (6) "aggressive behavior at the parole hearing." *Id.* at 2-3. These factors demonstrate
2  a nexus between the facts in the record regarding Petitioner's commitment offense, which the
3  Board may accept as proven and true, and the ultimate conclusion that Petitioner still posed a risk
4  of danger or threat to the public. These factors also independently demonstrate some evidence in
5  the record that Petitioner was not suitable for parole. The Superior Court, therefore, properly
6  concluded that the Board's decision withstands the minimally stringent "some evidence" test and
7  has not violated Petitioner's right to due process of law.

8                                   VI. CONCLUSION

9        For the foregoing reasons, IT IS HEREBY RECOMMENDED that Petitioner's
10  application for writ of habeas corpus be DENIED.

11       These findings and recommendations are submitted to the United States District Judge
12  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one
13  days after being served with these findings and recommendations, any party may file written
14  objections with the court and serve a copy on all parties. Such a document should be captioned
15  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections
16  shall be served and filed within seven days after service of the objections. Failure to file
17  objections within the specified time may waive the right to appeal the District Court's order.
18  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57
19  (9th Cir. 1991). In any objections he elects to file, Petitioner may address whether a certificate of
20  appealability should be issued in the event he elects to file an appeal from the judgment in this
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///

                                        18

1 | case. *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or

2 | deny certificate of appealability when it enters final order adverse to applicant).

3 | DATED:        September 15, 2010.

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

19